Good morning, everyone. Judge Rendell and I are thrilled to have sitting with us this week the Honorable Sandra Day O'Connor. Justice O'Connor, you do us honor by joining with us in deciding these cases, and this is a memorable day in the history of the Third Circuit. We are very, very grateful to you. Thank you so much. Thank you, Chief Judge. It's a great privilege for me to be here in this very distinguished circuit and sitting with the two of you. Thank you. Thank you. Edge. Thank you very much. I have worked with Justice O'Connor on a number of civics education initiatives, so I want to express my appreciation not only to her but also to Chief Judge Sirica for allowing me to be part of this panel. The first matter this morning is Hohider v. United Parcels. Mr. Perry. Thank you, Mr. Chief Judge, and may it please the Court, if I may, I'd like to reserve five minutes for rebuttal. Your Honors, the wildly divergent claims of tens of thousands of persons seeking highly individuated relief, including billions of dollars in money, cannot be certified as a class action under Rule 23b-2. That is a central question in this case. That question has squarely been resolved against these plaintiffs by the decisions of the United States Supreme Court and this Court. Isn't this a classic 23b-2 where the class is complaining of three practices of UPS and they are seeking declaratory relief, injunctive relief, training, all kinds of equitable relief with very little mention of any monetary relief? Your Honor, first, on what they're actually seeking, these plaintiffs are seeking compensatory and punitive damages and back pay. The two named plaintiffs, Hohider and DiPaolo, their claims alone are for $3.75 million. If we multiply that times the class plus punitive damages, we get up into the billions. Are punitive damages requested in the complaint? Yes, they are, Your Honor. But they were severed out, were they not? Well, the –  They cannot be severed out. The rule for 23b-2 on money certification is what relief the plaintiffs choose to seek in their complaint. Rule 23b-2 only applies if injunctive or declaratory relief is appropriate for the class as a whole. Judge Rendell, this class does not seek anything for the class as a whole. It seeks money on an individual basis and even the injunctive relief sought is highly individuated. We have thousands of plaintiffs working scores of jobs with dozens of impairments, some of which may or may not be disabilities, seeking hundreds or thousands of accommodations. And the injunctive relief sought by these plaintiffs is an individualized accommodation for each class member. What they clearly say in their brief and in the proceedings below is that at this mysterious phase two that everything complicated is going to get shoved into, the district judge is supposed to somehow fashion an individualized equitable remedy for every single class member. There is no – of the class certification and the application of Teamsters. In other words, couldn't – didn't the court properly certify this for purposes of injunctive relief leaving the back pay issue as something that only would apply if there were a protocol relating to the class itself? No, Your Honor, for two reasons. First, assume there's no monetary relief in this case. This still cannot be certified as a class action. A typical B-2 case that might have a single impairment, deafness for example in the Bates case, and a single position, drivers in the Bates case, might in the appropriate case with an appropriate plaintiff be certifiable under B-2 because the court could truly enter an injunction applicable to the class as a whole. That's the case in the Bates case out in the Ninth Circuit. So your position is that would make it more like the typical Title VII case if there were a single impairment. Your Honor, the B-2 case is the sign on the wall that says no Irish need apply. And the plaintiffs who are members of that class, Irish persons who are otherwise qualified to work for that company can go in and ask for an injunction to have that sign taken down and access to the workforce. Just like the deaf plaintiffs in Bates claim to have access to that single position to which the standard applies. Here on every vector, this case is different than that typical case. These are different jobs. The impairments here range from brain tumors to flat feet. The accommodations range from power steering to dollies to interpreters to all kinds of different things. There is no common thread that ties this class together. But if all of them were told you cannot return to work until you are 100% cured, isn't that just like no Irish need apply? No, Your Honor, it's not for two reasons. First, if we look at the named plaintiffs' individualized circumstances, they clearly were not told that. They were run through the ADA compliance policy, the 10-step policy that at least on paper complies in every respect with the EEOC guidance here. So these plaintiffs, the named plaintiffs in the lawsuit, they weren't told they couldn't come back to work. They were told they would run through the ADA compliance policy. Second, even if these plaintiffs could prove that there is this so-called 100% policy, which they haven't and which the district court did not find, expressly did not find that there is any such policy at UPS, and UPS vehemently denies that there's any such policy, that would only mean that each plaintiff would have to be accommodated. This is a failure-to-accommodate case. It's not an access-to-work case, ultimately. Their ultimate claim by these plaintiffs is that UPS is required to afford an individuated accommodation to each and every class member based on that class member's specific job, the tasks of that job, the impairments that that employee claims to preclude him or her from working at that job, and other factors that all devolve to the individual. Does that mean, then, except for a single-issue disability, such as deafness, for example, that this kind of case is simply not eligible for a B2 certification at all? And what would happen if there were a written policy, let's say 100% policy? You're saying that they would not be able to maintain a class action in this kind of a case? Your Honor, in an ADA 102B5 case, which refers to employment qualifications, Congress expressly authorized a class of persons to proceed under the ADA. We acknowledge, we've acknowledged in our brief, and I believe Bates is actually an example. There's different problems in Bates, but Bates is an example of a qualification case that can be challenged in the appropriate case under B2. We are not saying there's no such thing as an ADA class action. This claim is not a B5 case. This is a 102B6 case. The core liability theory here is that UPS failed to accommodate each and every class member. To prevail on that case, the class member, in an individual case, to take the easy example, it is undisputed under this Court's precedence in Williams v. Taylor and the Supreme Court's precedence in Sutton, that each individual would have to prove that he is disabled, that he is otherwise qualified for the position, and that he requested and was refused a reasonable accommodation. All individuated determinations. The employer then has the opportunity to defend based on undue hardship, based on business necessity, based on direct threat. Again, all individuated decisions. If all of those hoops can be jumped through, then we have the question of individuated injunctive relief, back pay, compensatory and punitive damages. At every stage of this lawsuit, the questions presented and the questions that must be answered by the trier of fact are highly and specifically tailored to the individual employee and his relation to the employer. But aren't you going to have that even in a Title VII context, where as to each individual, the company is going to have to show that there were a legitimate basis for the firing of the person as compared to racial or gender or whatever it is? I mean, you're always going to have individual components. The question is whether a class could be certified at all for certain purposes, and here it would seem that the three practices that they're alleging would be common and would be something that is not individualized but could be proven for the benefit of the class as a whole. How else is this kind of case going to be pursued against a UPS that has these policies? I'm asking several questions, but isn't this exactly what the class action is meant for, showing these kinds of patterns and practices? Your Honor, it absolutely is not. And again, I will return to the prototypical no Irish need apply case. There are legitimate employment class actions. We don't dispute that. The ADA differs from Title VII. The nature of the inquiry is more individual specific at the outset. Disability, the core entitlement to claim the protection of the statute to say that one is disabled is a hotly contested issue. Employers win more of those cases in the appellate courts than employees on the core question of disability. In a Title VII case, I've never lit a case, Your Honor, and this Court has seen more cases than I have, in which there's a serious question as to whether the claimants are women or African Americans or even if they share the religious beliefs at issue. Whereas in an ADA case, the core question, Mr. Hoheider, he has back pain. He's been found by an arbitrator to not be disabled, yet he wants to bring a class action on behalf of a group of persons who may similarly not be disabled. The plaintiffs recognize this problem, Your Honor. In their class definition, they identified the class as disabled persons within the ADA who have these other things. And that's a standard class definition in employment discrimination cases. A Title VII case says all female employees of GM or all Hispanic employees of Chrysler. It doesn't say all employees. This claim, where they initially identified it as all disabled employees, the district court struck that element from the class definition precisely because it would require too many individuated determinations just to figure out who's in the class. Just to figure out who can claim the entitlement to the protections of this statute before any liability or remedies question. May I ask a question, Mr. Perry? I think the ADA statute has been amended now by Congress, and as of January, the new provisions go into effect. Is that right? That's correct, Justice O'Connor. And they have substantially changed what constitutes a disability, have they not? It has changed it somewhat, Your Honor. And there's no mention of that new legislation in the briefs? Your Honor, it was enacted after the briefing. There's actually a mention of the pending legislation in our reply brief and a footnote, and the actual legislation was enacted later. Let me answer that two ways. First, the legislation itself does not apply except to cases filed after January 1st. That's the interpretation of the EEOC and the OLC. But second, it is important to this case. Their core claim, Mr. Chief Judge, to return to your question, on B-2 certification is that this is a claim for injunctive relief. They have abandoned any claim that they're actually disabled. This is only a regarded-as disability case. You see that in their brief. They'll admit that when they get up here. In the ADA Amendments Act, Congress very clearly says an employer need not accommodate a person whose sole claim to disability is being regarded as disabled. An employer need not accommodate regarded-as disability persons. What injunction could these people possibly get after January 1st if UPS has no statutory obligation? Even if they could prove that every member of the class is regarded-as disabled, UPS after January 1st has no obligation under the ADA to give them any accommodation. And no federal court can order UPS to give an accommodation that's not required by the statute. Their entire claim for injunctive relief, Justice O'Connor, has been removed by this statute. They have no claim for injunctive relief. All that's left is money damages, back pay, and individual injunctive relief, such as reinstatement or adjustment of position, all of which run smack into the Barnes decision, the problems of cohesiveness. Will that apply to cases filed before the effective date? Your Honor, the core provisions of the amendments do only apply to cases filed afterwards. The accommodation provision is stated not as an element of the plaintiff's cause of action, but rather as an obligation on the employer. It says, no covered entity, which is ADA-speak for an employer, need provide an accommodation to any person whose sole claim for disability is being regarded as disabled. So it's removed the obligation on the employers, and this was a compromise struck during the legislative process between the... And that would apply even in this case? I would submit... That would have to be mitigated. Your Honor, I would submit that if UPS has no statutory obligation to accommodate, Judge Conte or any other district judge has no power to order us to accommodate. It would be an injunction beyond the power of the statute. And remember, before the amendments, that was the law in most circuits. The Ninth Circuit and the Seventh Circuit had held that there's no duty to accommodate regarded as persons. We raised that conflict in our briefs. This court in the Williams case had gone the other way. The Congress has now resolved it on a prospective basis. But remember, in a B-2 class, the court question is the prospective relief sought by the plaintiffs. Because to get themselves into B-2, they have to claim that they are seeking prospective relief applicable to the class as a whole. Well, they aren't. Excuse me. What if this injunctive class were limited to only back pay relief? Would it qualify? No, Your Honor. The statute, Rule 23, B-2 says injunctive or corresponding declaratory relief. Back pay is monetary relief. The Fourth Circuit in the Thorn case held clear as day that a claim for back pay doesn't qualify on its own feet for B-2 certification. This is . . . Why wouldn't it be incidental to or part of the injunctive relief? Well, there's no injunctive relief available and B-2 . . . No, but assuming there were. Your Honor, for two reasons. It is monetary relief, and what's at issue here are the rights of the absent class members. They propose a class. Remember, UPS could win this mysterious Phase 1 that the District Court has proposed. All the absent class members' rights would be cut off. This is the constitutional question the Supreme Court confronted in the Thai Court case and has never answered, whether monetary relief in a B-2 case. This Court, in the Barnes decision, went a long way to answering it, though, by saying that if there's a significant risk, that the absent class members' rights would be cut off. And second, if to get to that place, the Court would have to resolve a large number of highly individuated issues, then we know that B-2 isn't appropriate because . . . Opponents, however, say that Barnes is a personal injury case and doesn't apply in the employment or disability context. Your Honor, and that's their only answer to Barnes, and I would submit it's not a very good answer. This Court has already held in several subsequent decisions that Barnes is a general 23B-2 case that's not limited to the personal injury context. And the rationale of Barnes is in no way tied to the cigarette addiction theory in that case. It is tied to the risks to the absent class members and the risk to the judicial system of trying thousands of highly individuated claims in a mandatory, no opt-out, unconstitutional proceeding that could bind and deprive the absent class members of their rights. This is, at bottom, Your Honors, a B-3 case. It's not a good B-3 case, but it's a B-3 case. It is a claim for money and individuated relief on behalf of a widely divergent group of persons, hundreds of jobs, thousands of issues. It just can't be tried as a class action. Let me just ask one question. Aren't you, in essence, saying there can never be a B-2 action under the ADA? No, Your Honor. There can be either in two contexts, in the 102B-5 qualifications context or in the single impairment, single position context, like Bates, deafness and driving. I do think there is an appropriate place for B-2 class actions in an appropriate case. This just isn't that case, Your Honors. And it would require the Court to not only break new ground, but to disavow numerous precedents of this Court and the Supreme Court to get there. Thank you. Any other questions? Mr. Perry, thank you very much. Ms. Skolnick. Good morning. Good morning, Your Honors. I would like to beg the Court's indulgence in putting up with my voice. I, like my class members, am less than 100% and I'm working through laryngitis. I hope it will not be too difficult to hear. Thank you. This case is about UPS's systemic company-wide practices that injure employees throughout the country and deprive them of the ability to return to work after illness or injury in violation of the ADA. The District Court in this case made findings based on a voluminous record, and her findings were very carefully honed, that UPS regularly, routinely, as a standard operating procedure, evades the prescriptions of the ADA by engaging in three unlawful acts. The first is the 100% no-restriction-or-return-to-work rule. She found that this rule was applied across the country based on EEOC determinations, that it was not only applied to the individual but that it was a company-wide practice based on declarations from more than 50 persons, including supervisors, who not only experienced the release themselves, but the supervisors actually discussed in the declarations how they were coached and trained in the de facto practice of not letting anybody come back an absolute bar to UPS reemployment after illness or injury. D'Angelo was a supervisor in the Charleston District, and it's JA367 in his declaration where he says that he was repeatedly told by the district safety manager, one of the people in charge with implementing the ADA. Ms. Skolnik, can you prevail in this case if we do not accept your argument on the Teamsters pattern or practice way of handling this class action? It would make it more difficult, and it would reject a framework, a paradigm that's worked in 30 years in applications of many different cases. And it has worked very well in Title VII. Obviously, the essential question that both of you have spent a lot of time on is, is this like Title VII or is it something different? Is it structurally different? And because of the elements that someone who alleges they're disabled has to prove, qualification, the disabledness, and perhaps the reasonable accommodation, does that make it just a different being entirely? No, it doesn't, Your Honor. Let me answer the first question that we do not need Teamsters in order to prevail. The case of Hendricks Robinson in the 11th Circuit approved the certification of an ADA class action that was very, very similar to ours. It was not a qualification case. It was not a one-disability case. It was a practice of refusing to let employees return to work after being off work for a year. They've reached their maximum medical capacity. If there's not a job, they're not going to accommodate them in any job. That's a case very similar to ours because it's blocked at the gateway kind of case. And in that case, Teamsters, surprisingly, I don't think was even mentioned. But we think that Teamsters is the approved approach, which is not only used in Title VII, as you know, but in the ADA, in retaliation cases. It's been adapted in many different types of cases. And the defendants like to say that the district judge improperly imported Teamsters into the ADA, but that's not the facts, Your Honor. That's not the reality. The truth is that Congress imported pattern or practice ADA case into the ADA. It's in the statute. The remedies certainly were incorporated. The powers, the procedures, and the remedies. But Teamsters is a creature of the Supreme Court. It's not statutory, right? The burden shifting and the way it is applied, it really is a methodology. It's not a statutory scheme or a methodology that's incorporated in the statute, is it? Well, under the rules of statutory interpretation, if a statute adopts procedures and remedies and practices of another statute, Congress is presumed to know the existing law. And it would be very difficult to not know a law like Teamsters that was cited over a thousand times when the ADA was enacted in 1990. So I think Congress knew exactly what they meant when they said patterns and practices litigation. That clause from the ADA is incorporated in full. I'm sorry, that clause from the Title VII is incorporated in full in the ADA. But how does it work when you get to the second phase where presumably the pattern and practice has been proven? Under Teamsters, it is up to the employer then to show that there was no violation. And with Title VII, that's showing the legitimacy of the firing or whatever. But here, should the employer be the one to have to unjump through the hoops, if you will, for the plaintiff with respect to all of these various aspects of disability, improving disability? Well, it's not all these various aspects. Let me clarify one point that my opponent made. This is not just a prong one case or a prong two case or a prong three case under the ADA. The ADA covers disabled people who are actually disabled, prong one. Two, who have a record of disability. And three, who are regarded as by their employer as disabled, whether or not they actually are. It could be a mistake. Now, that's our class members. It has to be qualified, and that's going to be a determination of what they're capable of and what jobs were available at the time. Many, many hoops that a plaintiff of this kind has to jump through. In fact, Your Honor, there's no more hoops than the ordinary run-of-the-mill Title VII plaintiff has to jump through. The McDonnell-Douglas paradigm in Title VII includes qualification. The plaintiff has to prove as a prima facie case that he or she is qualified for the job. In fact, if Title VII would say that non-qualified persons, just because they're a member of a protected minority group, can get a job, it would probably have been struck down as that portion being unconstitutional. So qualification is in Title VII. It's not in the statute. It's in the case law that's been interpreting it since 1964. Qualification is the same issue under Title VII and under the ADA. Now, as far as to protect the burden of proof throughout, no, we do it exactly like Teamsters. Once we've proven our case in chief, our liability, that these practices that we allege in the court found sufficient reason for class purposes, once we prove that it's on the merits, this is what UPS does, which we're confident we'll do. But there is Supreme Court language that the burden of proof always stays on the plaintiff in the ADA case. The burden, yes, the burden of proof remains on the plaintiff, but once the plaintiff makes out its liability case, it doesn't just disappear, as Teamsters said. The presumption then shifts that every individual action was made in accordance with this unlawful policy. So the plaintiff goes into the second tier armed with a presumption, which the defendants can rebut by showing not qualified, just like they can show in Title VII, or they could show not a protected member in Title VII. And UPS, I'm sorry, UPS says that the fact that qualification is in the statute, and that disability is in the statute, how could you possibly find disability? There are so many different kinds of disability. There's only one kind of regarded as disabled, only one kind, and that means that the employer took action adverse to you because it regarded you as disabled, such as... Let's assume that you're right about that, and that Judge Conte was correct. How do you answer the cohesiveness argument? Because it would seem to me, and I was trying to figure out what a trial plan would look like in this case. Wouldn't it involve an individual determination on any number of issues for each claimant, case by case by case? No, sir, we don't think it would, and it actually couldn't under the order that was certified by Judge Conte. She, as she did at every stage of this case, at every stage of the decision, adopted the most restrictive standards that were urged by the employer on every matter of law. So she endorsed, or assumed that the Third Circuit would endorse, the incidental bright line Allison approach rather than the Robinson ad hoc approach that we advocated. So she said plaintiffs can go for equitable damage, for individual equitable make whole damages, back pay, and an opportunity for reinstatement, but they have to meet a very strict protocol, the Allison protocol, that has to be incidental to the injunctive relief, and it has to be automatic and calculated on a type of formula. Okay, that's with the remedy, but before you get to that, aren't there going to be individual determinations? Certainly on reasonable accommodation. On reasonable accommodation, it would seem to me there would have to be. No, I don't think that there would have to be. I think that as a practical matter, we're going to show through our anecdotal evidence in the first phase that there were many disabled people who were refused the opportunity to even get through the door and show, engage in the interactive practice at this court. Noted in Mengjian as a prelude to reasonable accommodation, there will be many people who will be able to show that they were disabled, that they were qualified, and it was impossible for them to get back to work. Her concept that you note of the back pay based upon a protocol that's applicable to the entire class, what could that be? Well, there are several things, and she's mentioned a few of them throughout the decision. It could be, and we believe that it is actually, the more that we're learning about UPS's record keeping, that it's a procedure that is really contained within the very fulsome records that UPS keeps of when people go out on disability, what the injury is, what the disability is, when they've asked for a return to work, when it's all in one system. That will be individualized. It's not like your security class action where if you bought this stock at this point and you're in the class, then everybody gets X. You really can't do that in an ADA case, can you? Yes, you can, because we're asking the equitable remedy, the injunctive relief, is not an accommodation. It's the opportunity to make your case for an accommodation that these people were blocked for, and they go into Stage 2 armed with that presumption that they were denied an accommodation because of the gateway unlawful practices. Tell me how it would proceed for an individual plaintiff then. An individual after we've won at Stage 1? Yes. One way, and I would like to mention that this is an interlocutory appeal, so we didn't have full discovery or any merits discovery, and that's why Judge Conte wisely preserved to herself the discretion to manage this case under 23D, which she has. But one way would be to have, I think it was the Allison court that said you need a computer and a good clerk to figure out the damages. That would be automatic. And you'd have, in this case, a computer and maybe a computer programmer sitting and looking at UPS's records and knowing what queries to ask it, which could determine everybody who was not allowed to come back. But they have to show they're qualified individuals with a disability. The class has currently formed only has people who've got workers' comp. The class includes a lot of people that probably don't qualify for relief. Isn't that true under the current formulation? No, the class includes people who were out and were not allowed back. So it does include other people for the most part. So people who had temporary, as I understand it, it was primarily people on temporary disability, or as Judge Randella said, people that were collecting workers' comp. No, the UPS has a system called the TAWS program that allows people with temporary disabilities who are on workers' comp to return to work. But that program is almost another per se violation because it only allows you to return to work for 30 days, which means that you have a temporary disability and you're not qualified under the ADA. Once it's more than 30 days, you can't come back under the TAWS program. They reject you. So for the most part, the class members will be people out on longer-term workers' comp or disability because of an illness or injury. And they will be looking for, it's primarily unskilled jobs. They will be looking to return to jobs that they know better than anyone else because they're returning workers. They know the jobs. And they will be presumed to be qualified, and they will be presumed to be regarded as disabled because UPS took adverse action against them. That perfectly fits the definition of regarded as disabled. And as far as the applicability of the new law, I disagree with something that Mr. Perry said. It does go into effect January 2009, and that issue was not briefed. But it seemed to me from the very quick reading I did of the Lange's graph case and some of its progeny that since this case is requesting prospective relief primarily, which is what it really is all about, Judge Conte will have to apply the laws that exist at the time. And the trial will be held in all likelihood after January 1, 2009. So the new act most likely will apply. The new act removes any doubt that Congress meant what it said back in 1990 when they said we want this act to be given a broad interpretation. The legislative history of the new act says this act mirrors Title VII. And the exact words in the act make it a far easier burden to show qualification, even under Prong 1, and we're still arguing record of and regarded as are at play here. But even under Prong 1, it's much easier to show a disability than the courts have interpreted the law to be. And, in fact, it says that we want the courts to spend more attention looking at the defendant's conduct. Do you think it applies to situations that occur before the law goes into effect? I think it does because I think first it's a clarifying statute. As I point out, we're not creating new rights or obligations. We're just clarifying what we meant back in 1990. So it's not imposing new burdens on people as a surprise. And second, I think the issue of retroactive application might not even come up under one of the holdings in Lansgraf that says when prospective relief is at issue, which it is here, you must apply the laws that exist at the time. You don't even get into looking at retroactivity, so you don't have to even do that difficult analysis. But the Act says, the new Act says that, and it's thinking about individual cases here, I believe, not class actions necessarily, we want you judges to spend more time focusing on the defendant's conduct rather than the extent of the plaintiff's disability, which fits perfectly and eases the burden of everybody on the second stage because most of our plaintiffs, class members, will be Class 1, Prong 1, actually disabled under the new Act. Now, as far as regarded as... Under the amendments, there'll be no regarded as. No, the amendments left the three categories unchanged completely. There's still the three categories, and we still use the same words for them, record of and regarded as. Now, under the regarded as, Mr. Perry is correct. They did say an employer has no obligation to accommodate a person who is solely, and that's a key word, solely entitled to protection under this Act as a regarded as person. Now, in the legislative history, they explain that, and they say, as Mr. Perry said, it's a compromise. But the reason we are willing to make this compromise, even though this Act is so important and should be so broadly interpreted, we're willing to make this compromise because we think there'll be very few people in that category if they were discriminated against by their employer, as every one of our class members were. They will likely be found to be actually disabled under Prong 1 because we've eased the burden so greatly. So it's only for those people. As a practical matter, when we get to the second stage here, I think what will probably happen is those people who asked to return to work could not provide 100% release but didn't need an accommodation. But UPS said, no, no 100% release? We don't want you, you're not 100%. They didn't even need an accommodation. They would be regarded as employees, and they wouldn't be asking for or needing an accommodation. What about the ones who might need an accommodation? How would that be handled? I think there's also very fulsome records on what the accommodation is. It's usually very minor things, such as a stepladder, power steering truck that UPS has, which is not buying a new one but just the use of one that it already has in its facility. Things that would be pretty ascertainable from the record. These are workers that the difference between this class and some of the wide-ranging classes in Title VII that have been approved is this is really a very, very narrow class. It's big just by the magnitude of the defendant's wrongdoing and by the number of its size, the number of employees. But the class doesn't even include in its definition that the people have to be qualified individuals with a disability. The class includes people who have been out of work or filed for workers' comp, which means people who do not qualify for any relief under the ADA are included in this class. How can that be? Well, that's not quite right, Your Honor. What the District Judge Conte did is she rewrote the class somewhat. She modified the plaintiff's version, which, as this Court knows, is proper under Chang v. Veneman. This Court did it themselves. And she took out any reference to the law because she knows of the circular reasoning of the ADA. Are you qualified and disabled? Well, it gets into a circle. So she made it very fact-specific. And the class includes those persons who have been out of work from UPS and have been unable to return because of one of these three reasons. But they may not be entitled to relief under the ADA. They may not be qualified individuals with a disability, which is your ticket to get into the ADA. So the class is over-inclusive and includes people who really aren't entitled to relief, doesn't it? No, it doesn't any more than a Title VII case that would say all women. Like, for example, in Dukes, all women who have been denied promotions, who have been denied training, who have had their pay held back is our class. That includes women who didn't deserve the promotion, who were unqualified for the promotion. It includes women who didn't want the training or couldn't do the training. But they are women. And our plaintiffs have a record of or is regarded as disabled. That's not what the class definition is. The class does not have any reference to qualified individuals with a disability. Disability includes regarded as. So doesn't that definition have to include disabled persons as defined under the law, which would include regarded as? It has to encompass them factually, which is exactly what this does. If you're out because of illness or injury and you can't come back because of a policy that doesn't let you even make a case for a reasonable accommodation, that's the definition of regarded as. You are being regarded as disabled by your employer. In most instances, these people, because of UPS's fulsome record-keeping, also have a record of disability, and that record will probably tremendously ease the second stage of this trial. If I could just quickly sum up. If this case is not affirmed, it would mean as a practical matter that you can have any ADA practice and policies class action in direct contravention to what Congress said in 1990 when they imported the statute in and in complete contravention to what they said in 2008, September 2008, when they said we meant it, when we said it, we want the remedies to mirror the remedies of Title VII. And with this district court judge who was so careful to avoid reversal by, in every turn, doing, going with the UPS. Not to be afraid of us. You don't put it quite that way. She's doing a good, thorough job. She found the facts scrupulously. She gave attention to the defendant's facts. She gave weight to the plaintiff's facts. And the reason that she did this is because the facts are overwhelming, intentional, blatant discrimination of a kind that is very similar to no Irish need apply. That's what our case is. It's if you're not 100 percent, don't come back. And it's really a narrow class of just former workers who know their job well, who want to come back. And the ADA says they should. And the problem of figuring out that the second stage of the hearing is too burdensome, cumbersome, not cohesive, and not manageable, that's for the district court to decide. She has the discretion to decide that. It's not before you. This is an interlocutory briefing. The full record is not before you. It belongs with the district court where she left it. That's one other problem is that she left some items to be decided later on. And the amendments to the civil rules in 2003 make pretty clear that the district court is not supposed to do that. It's supposed to make findings, make determinations prior to certification. It did, Your Honor. But if I may, in the Wachtell decision, which very carefully said you have to define the class and the claims and the issues and the defenses, it looked at the class and said this was well done. The rest of it wasn't done at all, but the class was well done. And if you look at the class, Your Honor, it's a tentative class. The district court said we are going to keep in all the HMO plans at this time. We might change that as the case proceeds, which is really quite similar to what Judge Conte said. We're going to keep injunctive relief at this time. But I may change my mind. Thank you, sir. Any other questions? Good. Ms. Skolnick, thank you very much. Thank you, sir. Mr. Perry. Thank you, Your Honors. Judge Rendell, this case is called Hoheider v. UPS. Mark Hoheider is not disabled. Mark Hoheider is not qualified. And UPS did not fail to accommodate Mark Hoheider. An arbitrator, after an evidentiary hearing, made all of those findings. It's in the record, JA 827. Judge Conte made some factual findings. She skipped a lot more factual findings. She made no factual finding that the named plaintiff in a class action lawsuit is qualified to claim the entitlement of the statute. She made no finding that the named plaintiff in a class action lawsuit was discriminated against by UPS. She made no finding that the 100% policy even exists. She made no finding that anything these plaintiffs are complaining about adversely affected the named plaintiff in the lawsuit. Mr. Chief Judge, that leads to this teamster's question. There are three ways to think about the teamster's question. Everybody agrees, Ms. Skolnick just agreed, that disability, qualification, and failure to accommodate are elements of the plaintiff's cause of action. Option number one is that every class member must bear the burden of proving those things before a liability judgment can be entered against UPS. That's UPS's position based on the text of the statute. Option number two is that some significant number of class members must make those determinations before a liability judgment can be entered. That's teamsters if you actually look at teamsters. In teamsters, the government plaintiff proved actual specific instances of intentional discrimination against 40 Hispanic surname truck drivers before any inference arose of discrimination against the 41st, which leads us to number three, option three, which is that nobody, no plaintiff, any class member has to prove disability, qualification, or accommodation before some judgment of liability, liability for what is a good question, gets entered against UPS. That's Judge Conte's position. That's these plaintiffs' decision. That's not teamsters. That has no basis in the law. It has no basis in Title VII. Option two teamsters, true teamsters, we don't think is consistent with the ADA for reasons in our brief, but at minimum, the named plaintiffs have to prove qualifications. That's the holding of the on-bank Ninth Circuit in Bates. I mean, this Court couldn't affirm this certification without creating a square conflict with the on-bank Ninth Circuit on that precise question in an ADA class action involving this same company, and, you know, we know that case pretty well too. The plaintiffs seem to say, seem to argue that the regarded as way of looking at this cleans up a lot of problems. Your Honor, they have a view of regarded as that is fundamentally, flatly, irreconcilable with the opinion that Justice O'Connor authored for the Supreme Court in Sutton, which explained what regarded as means. Regarded as, under the ADA, is an individualized determination. The employer must either regard an actual impairment as substantially limiting when it's not, or regard a nonexistent impairment as substantially limiting. Both of those are individualized determinations. There is no such thing as regarded as in gross. There's no case that says that. There's no theory that supports it. It's not in the statute. It's not in the amendments. And nothing changes that. That is Supreme Court precedent that their theory runs smack into. They can't explain it. They have no answer to that. This notion that regarded as floats around. Anybody you don't let back to work is regarded as disabled is nonsense. There is no case that says that. And if it were, then this class could be picked up and dropped, lock, stop, and barrel to every at least manual service company that has people that go out on workers' comp. Isn't there reference in the Bates & Bank opinion to the effect that a 100% cure policy is discrimination per se? The Ninth Circuit has a previous opinion called McGregor that held that in for a different company. We don't think that's right. I personally don't think there's any such thing as discrimination per se in the ADA. But look at the 100% in this policy. The most they can show is that if you have 100% that is a full work release from your doctor, you can go back to your previous position. If you don't have that, you have to go through the ADA compliance manual. That's entirely processed. That's entirely consistent with the EEOC's guidance. That's not discrimination because, remember, the ADA is a self-selection statute. The employer is not even allowed to ask about impairments and medical conditions and mental conditions and so forth unless the employee self-identifies as requiring an accommodation. 100% has nothing to do with that. We have, UPS has, a formalized policy that lets people go into that, which leads to the trial plan. At some point in this litigation, everybody, 100%, 10-step plan, temporary alternate work, anything, has to prove that they are disabled, qualified, and not accommodated. At some point in this litigation, the plaintiffs bear that burden of proof. Judge Conte simply punted that question. She said they're going to have some amorphous liability determination and then decide all that stuff later. That's not acceptable after 2003. That's not acceptable under Wachtell. It is simply putting the hammer of a class action against this company without any showing that the actual case could be tried, tried in a way that's good for the judicial system and tried in a way that protects the due process rights of the absent class members. Ms. Skolnick spoke for 20 minutes. I didn't hear her talk about those absent class members. It's a little odd for the company to be doing that, but I think it's a very important thing. This is a mandatory, no opt-out class action that they proceed to try here. We can win this case. If they want to try it as a class action, we can win it, and we will try it. UPS is not going to settle this case. We tried Bates for 10 years, and Bates is still going. This judge is going to have to try this case. She has shown no way that she can actually try it to the end, to a verdict, where something gets entered and is appealable as a final judgment to this court, but I think that's something that this court could take into account. Ms. Skolnick, Mr. Chief Judge, you asked her that question, and she said, well, that's not before the court. We'll have to work it out later. The whole purpose of 23F appeals is to make sure that a class action is possible before it starts so that we don't run into the due process problems five years down the road, so that we don't run back to this court on a mandamus petition or a 1292B or something else because this is a case that can't be tried. The Amendments Act, finally, Your Honor, if the court would like supplemental briefing, I guess we'd be happy to do that. I disagree on retroactivity and so forth. Well, we will discuss that, and if we wish further briefing, we will let the parties know. Any other questions? Good. Thank you very much. Thank you, Your Honor. The case was extremely well briefed and extremely well argued. We will take this matter under advisement. We would like to have a transcript of the oral argument and ask the parties to share in the cost of the transcript and check with the clerk's office, and we'll tell you how to do that. Thank you both very much. Thank you, Your Honor. Thank you.